UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
GLOBAL REFINING GROUP, INC., :

      Plaintiff, :

  -against- : Case No.: 1:21-cv-532

PMD ANAYLYSIS INC. a/k/a ANALYSE : **REPLY MEMORANDUM OF LAW IN**
PMD INC., ROBERT TURCOTTE, and    **FURTHER SUPPORT OF MOTION**
MONICA ARMSTRONG,                 **FOR PRELIMINARY INJUNCTION**
: 

      Defendants.
 :
------------------------------------- X

      Plaintiff GLOBAL REFINING GROUP, INC. ("Global" or "Plaintiff"), hereby submits this reply memorandum of law in further support of its motion for a preliminary injunction "Motion") against Defendants PMD ANAYLYSIS INC. a/k/a ANALYSE PMD INC. ("PMD") and its principals, Defendants ROBERT TURCOTTE ("Turcotte"), and MONICA ARMSTRONG ("Ms. Armstrong" and together with Turcotte and PMD, "Defendants").

**PRELIMINARY STATEMENT**

      The Opposition misrepresents Plaintiff's claims and misquotes Plaintiff's papers, taking words and phrases dangerously out of context. In this way, Defendants first argue that Plaintiff never defined what its trade secrets were – Plaintiff did. Global is not required to list the exact fire assay results for over eight thousand catalytic converters ("CATS") in order to prove that it has a trade secret in its pricing formulas, which uses those assay results as a variable. Defendants do not dispute the existence of the App; do not dispute that Defendant Turcotte signed up for password protected, access to the App under a restrictive license; do not dispute that the App contains pricing, photographs and information identifying the 8,079 CATS at issue. Moreover, Defendants now admit that they copied and used both Global's photos of CATS and Assay Information on the Infringing Website through January 4, 2021. Defendants were able to identify

-1-

these trade secrets when they copied them. There is no plausible argument that they do not know what the trade secrets are today, and no plausible argument that Global's trade secrets were not maintained under adequate secrecy.

Tellingly, Defendants make no attempt to refute allegations that Defendant Turcotte's former business partner informed Global that someone was reverse engineering its pricing formulas. Defendants similarly make no effort to explain their own words – that they intended to "STOP refining companies," like Plaintiff, from hiding the "REAL PRICE for your catalytic converters." [ECF 30-main, ¶ 10]. Indeed, they now admit that they used Global's pricing to set their pricing, but allege that they switched to completely independent sources of pricing information on January 4, 2021, and replaced nearly 8,100 prices overnight. Defendants' contentions are not plausible or credible. Despite their denials, all credible evidence compels the conclusion that Defendants continue to use and sell access to Global's trade secret database. Indeed, were Defendants not still harboring and using the database, an injunction against its further use would have no impact on Defendants, and should not be objectionable to them. As Defendants claim not to be using Global's database, such an injunction would cause no harm to Defendants, at all, yet Defendants claim that granting an injunction will mean the end of their business. Defendants have opposed any effort to obtain a commitment that they not sell or traffic in Global's trade secrets. For the foregoing reasons, those stated in Plaintiff's moving papers, and the reasons that follow, Plaintiff respectfully requests that the Court grant Plaintiff's request for a preliminary injunction.

**FACTS**

Plaintiff incorporates by reference its opening memorandum and affidavits. Plaintiff also relies upon the Supplemental Declaration of Iga Wolotowski, dated April 13, 2021 ("Supp. Wolotowski Decl.").

**ARGUMENT**

I. **GLOBAL HAS ESTABLISHED THAT IT HAS PROTECTABLE TRADE SECRETS**

As stated above, Global has sufficiently alleged the existence of a trade secret in the valuable Assay Information. *See* Complaint [DE 1], ¶¶ 17-30, 38, 62-68; Wolotowski Decl. dated March 26, 2021 [DE 29], ¶¶ 2-11; Memorandum of Law in Support of Preliminary Injunction [DE 28], pp. 3, 15-16. Tellingly, Defendants did not move to dismiss the Complaint for failure to identify a trade secret. Defendants also admit that they copied more than 8,000 of Global's photographs, and based their pricing formulas for the Infringing Website off the prices in Global's App, until January 4, 2021. [ECF 34, ¶ 9]. The photos and fire assay tested PGM loadings, together with the make, model number and serial number, comprise the trade secret database. *See* Complaint at ¶ 68; Wolotowski Decl. dated March 26, 2021 [DE 29], ¶ 2.

Defendants market their Infringing Website on disclosing the "REAL PRICE" of CATS known only to the big refining companies. See Mercer Decl. [DE 30-main, ¶ 10]. Clearly, Defendants perceived value in this information, or would not have developed a secondary business around selling it. Indeed, the whole sales pitch is predicated on leveling the playing field for small sellers by disclosing to them the pricing formulas based on assay information known only to the big refining companies – by implication, hurting the bottom line of the big refining companies, to wit: Global. The most valuable variable in the pricing formula for a Cat is the Assay Information, i.e. the precise ratio of PGMs in the Cat. *See* Complaint [DE 1], ¶¶ 62-68.

This variable is valuable for two reasons: (1) it informs the parties of the true market value of the specific Cat, and (2) it costs money to discover it (the destructive cost of each Cat involved in the test and cost of the fire assay test itself). This is the precise information that Defendants offer access to on their Infringing Website, only moving up or down based up the market price of the PGM—just like Global does it. As such, Defendants' argument that Plaintiff has not adequately alleged its trade secret is without any basis.

## II. DEFENDANTS REVERSE ENGINEERED THE APP

Defendant Turcotte had a limited license to access to the App. In violation of restrictive licensing terms, Defendants reverse engineered the pricing information from the App to devise Global's pricing formula comprised of (a) the ratio and amount of each PGM within each Cat and (b) the market price for each PGM. We know this, both because Defendants admit that their pricing formula prior to January 4, 2021 consisted of a 6-10% reduction in Plaintiff's pricing, and also that the screenshot of the Infringing Website, attached to the Armstrong Declaration as Exhibit E, contains prices that are *exactly* 10% less than the prices in the App. on the same date. *Compare* Armstrong Decl. at Exhibit E *with* Supp. Wolotowski Decl. at ¶¶ 11-12, Exhibit 11.

Like Global's App, Defendants' prices change with the fluctuation of the market price of PGMs, so either Defendants reverse engineered Global's pricing – as Defendant Turcotte's former business partner said he did – or they manually re-calculated and re-entered more than 8,000 prices on a daily basis. It seems far more likely that they reverse engineered the PGM loadings—in violation of Plaintiff's terms of use. *See* Supp. Wolotowski Decl., ¶ 13, Exhibit 12. Defendants claim that they cannot still be misappropriating trade secrets when their access to the App was cut off on January 4, 2021, but Defendants do not need access to the App once they reverse engineer the PGM loadings.

### III. STRONG CIRCUMSTANTIAL EVIDENCE SUPPORTS GRANTING A PRELIMINARY INJUNCTION

There is a big difference between circumstantial evidence and blind speculation. Plaintiff has put forth a strong circumstantial case against Defendants – something that is explicitly recognized by the courts in trade secret cases as being credible and sufficient evidence. *See*, *e.g.*, *ExpertConnect, LLC v. Fowler*, No. 18 CIV. 4828 (LGS), 2020 WL 57518, at *1 (S.D.N.Y. Jan. 6, 2020) ("[t]his 'very powerful circumstantial evidence of misappropriation of trade secrets' was sufficient to deem that Plaintiff was likely to succeed on the merits."); *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17 CIV. 4819, 2020 WL 3429775, at *5 (S.D.N.Y. June 23, 2020), *aff'd in part and remanded*, 838 F. App'x 588 (2d Cir. 2020).  (circumstantial evidence of misappropriation plus failure to allege material facts in dispute, "except to make the blanket assertion that Plaintiffs allege 'complete fabrications,'" supported "reasonable conclusion that Defendant Willis misappropriated Capstone's confidential information.")

A preliminary injunction is also warranted, however, because Defendants have *admitted* to using and copying Global's photos and pricing information/formulas along with the *selection* of CATS and identifying information (i.e., make, model, serial number). They incredulously claim that they used their "own pricing methodology," which "until January 4, 2021" was just Global's pricing formula discounted by 6-10%.  However, and in any event, as of April 9, 2021, Defendants are still using Global's pricing formulas (comprised of the Assay Information) with those same discounts. *See* ECF 34-5; Supp. Wolotowski Decl., ¶ 11; Exhibit 11.

In a letter dated January 28, 2021 from Defendants' counsel, Defendants previously denied that they had made any use of Plaintiff's Assay Information. *See* Mercer Decl., at Exhibit 2 [ECF 30-2]. Therein, Defendants claimed, "there is absolutely no evidence of any misappropriation of data or technology that would qualify as a trade secret of Global. Indeed . . .

PDM employs its own database of xrf analyzer and assay information." *Id.* Defendant Armstrong now admits that this was not true. *See* [ECF 34-main]. The January 28 letter also makes no reference to obtaining pricing information from "publicly available" sources.

Although Defendant Armstrong claims that "PMD has always used its own methods for pricing the precious metals found in the Cats," before Global revoked Defendant Turcotte's access to the App., those "methods" consisted of discounting Global's prices. Defendants indisputably used Global's Assay Information to set pricing for the Infringing Website. They simply contend that what they copied, reverse engineered or stole from the App was not a trade secret. If it was, they have already admitted to its misappropriation.

### IV. GLOBAL'S PRICING IS PROTECTABLE AS A TRADE SECRET

Defendants contend that "pricing" is not a protectable trade secret, but this too is a misdirection. *See* [ECF 33, p. 9-10]. The prices in Global's App were determined by conducting fire assays on more than eight thousand CATS, at a cost of an average $400-per-CAT (plus roughly $200-per-CAT for the value of the precious metals destroyed in a fire assay), over a period of five years. *See* Complaint [DE 1], ¶¶ 17-30, 38, 62-68. The fire assays reveal the PGM loadings. *See id*. The PGM loadings, multiplied by the price of the precious metal components, yields the pricing. *See id* at ¶ 53 ). This is unlike any of the cases, cited by Defendants, where courts found that mere pricing, *alone*, was not protectable as a trade secret.

### V. GLOBAL'S DATABASE OF PHOTOS AND PRICES IS NOT PUBLICLY AVAILABLE

Whereas it took Plaintiff five years to develop its trade secret database, Defendants claim that they remade theirs in one day – after admittedly copying Plaintiff's. In support, they cite to a number of purportedly "publicly available" Websites, that all charge fees, require passwords, contain restrictive licensing terms, are, themselves misappropriating Global's trade secret

database, or contain only static price ranges. *See* Supp. Wolotowski Decl., ¶¶ 3-4, Exhibits 4-10. Defendants do not even allege that they signed up for or were a customer of any of the Websites. It is wholly implausible that Defendants could recreate an entire database of prices in one day, based on seven Websites, a book, and an XRF analyzer. *See* Supp. Wolotowski Decl., ¶¶ 14-17. Defendants simply are not credible in their claims or testimony, and their denials should not be credited by the Court. *See Capstone Logistics Holdings, Inc.*, 2020 WL 3429775, at *5 ("blanket assertion that Plaintiffs allege 'complete fabrications'," insufficient to withstand claim for misappropriation of trade secrets).

## VI.  GLOBAL PROTECTS THE SECRECY OF ITS TRADE SECRET DATABASE

Global sufficiently pled the steps it takes to protect its trade secret database. *See* Complaint [DE 1], ¶¶ 39-49; *see also* [DE 29], ¶¶ 11-18. Defendants wholly misrepresent and distort those pleadings, allegations and evidence. The worst of these distortions is the claim that Global made its database available to "other competitors." [ECF 33 at 10]. Nowhere did Global allege this, but the words "other competitors" do appear in Plaintiff's Memorandum in an entirely different context: "Very few, if any, **other competitors** possess[ ] such an extensive database, to Global's knowledge, or one with such accurate results." [DE 28 at 15].

Defendants also cite cases about information available through a Google search, which bear no relation to the facts in this case. *See, e.g., Sasqua Group., Inc. v. Courtney*, No. cv-10-528(ADS)(AKT), 2010 WL 3613855, at *6 (E.D.N.Y. Aug. 2, 2010). *No one* can gain access to Plaintiff's database by performing a Google search. Most competitors have password protected databases *for their customers*, and one company – Kanect Recycling – is selling information that Global recently learned was misappropriated. *See* Supp. Wolotowski Decl., ¶¶ 3-8. Defendants do not provide any details about those databases, the requirements to gain access, or whether

they are available to non-customers, or smaller sellers. *Id*. Finally, if the "REAL PRICE" of CATS was readily available to the public through a Google Search, Defendants would not have a business. It is wholly ironic that Defendants marketed access to their Infringing Website on the cache of disclosing industry secrets available only to larger players, yet now argue that there are no secrets.

## VII. GLOBAL IS SUFFERING IRREPARABLE INJURY

Plaintiff has established that it will suffer irreparable injury absent the entry of an injunction. *See* Complaint [DE 1], ¶¶ 67-74, 77-81; [DE 29], ¶¶ 2, 10; Supp. Wolotowski Decl., ¶¶ 17-18.  Moreover, Defendants are openly selling access to a database based on Plaintiff's highly valuable database of PMG loadings to *anyone* who pays. This is not a case where the misappropriating party keeps the trade secret to itself. Continuing disclosure of its trade secrets will have profound consequences, which cannot be compensated by monetary damages.

## IX. THE EQUITIES FAVOR THE ISSUANCE OF AN INJUNCTION AND INJUNCTIVE RELIEF WILL FURTHER THE PUBLIC INTEREST

The Infringing Website was built on the back of Plaintiff's more than five million dollar investment in the App., and in total disregard of their restrictive license and Agreement with Global. Losing the fruits of Defendants' ill-gotten gains does not outweigh the harm to Plaintiff from the continuing use and disclosure of its trade secrets. Moreover, if Defendants truly developed their own pricing, an injunction prohibiting their use of Plaintiff's trade secrets wouldn't impact them at all, yet they oppose *any* injunction. They refuse even to acknowledge that Plaintiffs even possess trade secrets – to which they only obtained access under license. Under such circumstances, the equities favor the issuance of an injunction. Moreover, Defendants Turcotte and Armstrong also have a recycling business, which will still operate after the Infringing Website is shut down.

Defendants claim on the one hand that they are not competitors of Global, and on the other accuse Global of seeking a preliminary injunction "forestalling competition." *See* [DE 33 at 15]. Defendants' argument that their theft of Plaintiff's database benefits the public is both self-serving and misguided. The public does not benefit from the violation of intellectual property laws or contracts being dishonored. Although some individuals might profit by gaining access to Plaintiff's trade secrets – including Defendants – that is true of all trade secrets.

## X.    THE PROPOSED INJUNCTION IS NARROWLY TAILORED

Defendants argument that Plaintiff's proposed injunction is overbroad lacks any relationship to the facts of this case. This Court "may grant an injunction . . to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable [**and**] . . .if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret." 18 U.S.C. § 1836(b)(3) (emphasis added). The requested injunction asks the Court to do just that. Given the Defendants have admitted to using Plaintiff's trade secrets *and* breaching Plaintiff's contract, which prohibited copying and unauthorized distribution of Plaintiff's trade secrets and copyrights, an injunction tailored to remedy those violations is necessary and appropriate.

Plaintiff's requested injunction seeks to preserve the status quo as of August 2019, prior to when Defendants executed their plan to steal Global's information and photos. There can be no serious argument that preventing further, unfettered distribution of Plaintiff's trade secrets by disabling the website which sells that information, is well within the Court's "determination" to "require affirmative actions be taken to protect the trade secrets." *See* 18 U.S.C. § 1836(b)(3). Defendants' self-serving argument that it would effectively shut down their illegal business is of no moment, especially because courts routinely enjoin behavior which amounts to complete

cessation of business activities which threaten trade secrets. *See e.g.*, *WHIC LLC v. NextGen Labs., Inc.*, 341 F. Supp. 3d 1147, 1160-62 (D. Hawai'i 2018).

### XI. LITTLE TO NO SECURITY IS NECESSARY

Under Fed. R. Civ. P. 65(c), district courts have "wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm." *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Courts often deny bond when the restrained party has not shown a likelihood of harm absent the posting of a bond. *See, e.g.*, *Doctor's Assocs.*, 85 F.3d at 985; *Lighting & Supplies, Inc. v. Sunlite USA Corp.*, 2015 WL 3795858, at *1-2 (E.D.N.Y. 2015). Defendants will suffer no actual harm taking down the website using Plaintiff's Assay Information—which they have admitted to using and conceded would be a violation of Plaintiff's rights.

Alternatively, Defendants' claim that a "substantial bond" be issued is belied by Defendants' admission that they only profited (off of Plaintiff's photos and information, no less) $30,000 CAD (or about $24,000) from August 2019 to January 16, 2021–a 17.5 month period. This averages to about $1,370 per month. As dispositive motions are due October 2021, Defendants have no credible argument that—even upon their lax showing of harm—a bond exceeding $7,500 (~ 5.5 months x $1,370) could possibly be justified. Yet, given Plaintiff's strong likelihood of success and how little of information accessible on the Infringing Website is of Defendants' own creation, a $100 bond would be more than sufficient, should any bond be imposed at all.

Dated: Brooklyn, New York
April 13, 2021

      LEWIS & LIN LLC

      By:   */s/ Justin Mercer*
           Brett E. Lewis, Esq. (BL-6812)
           Justin Mercer, Esq. (JM-1954)
           81 Prospect Street, Suite 8001
           Brooklyn, NY 11201
           Tel: (718) 243-9323
           Brett@ilawco.com
           Justin@ilawco.com

           *Attorneys for Plaintiff*
           *Global Refining Group, Inc.*